# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

PATRICK RYAN,

       Petitioner,

v.                                No. CIV 09-1193 RB/LFG

LUPE MARSHALL, Warden, and
GARY L. KING, Attorney General
for the State of New Mexico,

       Respondents.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

1.      On December 17, 2009, Petitioner Patrick Ryan ("Ryan") filed a petition for writ of habeas corpus under 28 U.S.C. § 2254.  [Doc. 1.] Ryan is confined at the Western New Mexico Correctional Facility in Grants, New Mexico and proceeds *pro se*.

2.      On February 12, 2010, Respondents Lupe Marshall and Gary L. King filed an Answer with exhibits.  On March 29, 2010, Ryan filed a two-page traverse to the Answer. [Doc. 13.]

3.      As part of its review of Ryan's § 2254 petition, the Court considered his petition [Doc. 1] and Respondents' Answer, with exhibits [Doc. 10], and Ryan's traverse [Doc. 13].

---

[1]**Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.**

4.      As grounds for federal review, Ryan brings four claims:  (1) denial of due process based on State's alleged withholding of <u>Brady</u> evidence; (2) denial of due process based on State's submission of false and tampered with evidence; (3) denial of due process based on State's reliance on inadmissible and unproven scientific evidence (4) ineffective assistance of trial counsel based on 17 different grounds, many of which are overlapping. [Doc. Nos. 1, 10.]

5.      Respondents concede that Ryan exhausted most of the claims in the federal habeas petition but are not certain whether three of the 17 grounds of ineffective assistance of counsel claim were exhausted. [Doc. 10, p. 13, ¶ 14.] If not exhausted, Respondents assert that the Court may either dismiss the petition, without prejudice to allow Ryan to return to state court to exhaust any unexhausted claims, or deny the petition on the merits, notwithstanding Ryan's alleged failure to fully exhaust all of his claims.

6.      Respondents do not challenge the timeliness of Ryan's federal habeas petition, and the Court concludes it was filed within the required one-year limitation period.

7.      Respondents assert that Ryan's habeas petition is subject to summary dismissal irrespective of the possible failure to exhaust particular subclaims of alleged ineffective assistance of counsel. [Doc. 10, pp. 13-14, ¶ 15.] They argue, in part, that Ryan did not allege or establish the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, federal law as determined by the United States Supreme Court; or, resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings. [Doc. 10, p. 14, ¶ 16 (*citing* 28 U.S.C. § 2254(d)].  Respondents further request that the Court deny the federal habeas petition and dismiss it with prejudice.

8.       The Court considered whether to conduct an evidentiary hearing under 28 U.S.C. § 2254(e), and whether it needed additional briefing on any of the issues, but determined that neither

was necessary.  After a thorough review of the pertinent law, pleadings, and exhibits, the Court recommends that Ryan's § 2254 petition be denied and dismissed, with prejudice.

**Factual Background**

9.      The Court summarizes the factual history from the New Mexico Court of Appeals February 16, 2006 opinion, affirming Ryan's convictions. [Doc. 10, Ex. J; State v. Ryan, 2006-NMCA-44, 139 N.M. 354, *cert. denied,* 139 N.M. 429, *cert. denied*, 549 U.S. 899 (2006).] In addition, the Court cites portions of the factual background as asserted in Ryan's and the State's underlying appellate pleadings.

10.      During the fall of 1996 through the spring of 1997, Ryan[2] and Jennifer Lisignole (formerly Jennifer Cashman) ("Cashman")[3] worked as wildlife biologists for the Hornocker Wildlife Institute ("Hornocker"),[4] studying black bears[5] in a rural area near Reserve, New Mexico.[6]  They worked in a trailer or  "bunkhouse" owned by Hornocker, and both stayed overnight in the bunkhouse frequently, although Ryan owned a home in Gallup.

11.      Ryan and Cashman shared common areas of the bunkhouse and retained separate private bedrooms. [Doc. 10, Ex. D, Ryan's Appellate Docketing Statement, p. 3.]

---

[2]Ryan was a wildlife biologist for over 16 years and had been working on the Hornocker bear project in the Gila National Forest for 18 months when Jennifer Cashman started her work on the study. [Doc. 10, Ex. G, p. 3.]

[3]Cashman was 34 years old and divorced when she joined the Hornocker bear project as a wildlife biologist on her first job out of school. [Doc. 10, Ex. G, p. 3.]

[4]Hornocker is a research organization that studies bears, wild cats, and their habitats in the west. [Doc. 10, Ex. G, p. 3.]

[5]The study involved tracking and trapping bears, equipping them with radio collars, and in winter entering their dens.  The biologists' work required them to tranquilize the bears. [Doc. 10, Ex. H, p. 3.]

[6]Reserve is a mountain community of about 452 people.  The Gila National Forest surrounds the area. [Doc. 10, Ex. G, p. 3.]

12.     During the black bear study, Ryan and Cashman used tranquilizing drugs to ensure their safety while they obtained data from the bears. [Doc. 10, Ex. D, p. 3.]

13.     In late 1996, Cashman began to suffer from amnesia, blurred vision, exhaustion, fevers, hallucinations, headaches, insomnia, light sensitivity, nausea, respiratory dysfunction, ringing in the ears, slurred speech, tremors, vertigo, and other ailments.  Her illness persisted throughout months, despite periodic treatment and several hospitalizations.  On December 17, 1996, Cashman fell unconscious and was treated for suspected carbon monoxide poisoning.  (In Ryan's Docketing Statement, he claims both he and Cashman were hospitalized on December 17 and diagnosed with carbon monoxide poisoning; Doc. 10, Ex. D, p. 4.)  On March 23, 1997, Cashman collapsed again, at which point, a friend found her with Ryan at the bunkhouse.  The friend, Margaret Kirkeminde ("Kirkeminde")[7] called an ambulance even though Ryan objected.  Cashman was briefly hospitalized and released, after doctors believed she suffered a relapse related to the earlier suspected carbon monoxide poisoning.

14.     On March 26, 1997, Sheriff's Department officers found Cashman lying incoherent in the back of a truck.  She stated: "We're all dead . . . . We're all dead in the trailer."  These officers did not know about the prior incident of apparent carbon monoxide poisoning at the trailer bunkhouse.  They went to the trailer to see if anyone else might need medical assistance, but found no one there.

15.     Cashman was briefly hospitalized in the Silver City, N.M. hospital and then airlifted to Presbyterian Hospital in Albuquerque, where she remained two weeks.  She was in "very serious" condition, and her survival was in question.  Doctors struggled to diagnose and treat her condition.

---

[7]Kirkeminde is also a wildlife biologist. [Doc. 10, Ex. G, p. 5.]

4

They ruled out carbon monoxide poisoning but suspected that some other environmental toxin, rare disorder, or recreational drug might be the culprit.

16.     Forest Service Officer Tom Ennist and Department of Fish & Game Officer Nick Smith were both friendly with Ryan and Cashman.  Nick Smith's wife, Kirkeminde, was a close friend of Cashman's and had previously worked for the same wildlife study program.  Nick Smith had a key to the bunkhouse, and Ryan had informed both Smith and Ennist where a hidden key was located.  Ryan also invited both officers to use the bunkhouse whenever they liked.

17.     Around March 28, Ennist went to the bunkhouse to feed Ryan's dog.  Smith accompanied him and looked around for toxins while they were there.  The officers found no environmental toxins, but Smith saw a drug vial in Ryan's room.

18.     After spotting the vial, Smith began to suspect that Ryan might have something to do with Cashman's illness.  Smith expressed his suspicions to fellow law enforcement officers. Kirkeminde, who was frequently with Cashman at the hospital, asked an Albuquerque doctor about the possibility of someone drugging Cashman with sedatives used on bears.  Hospital tests failed to confirm this possibility, and Smith assumed he had been mistaken about the drugs.  However, Smith was still suspicious that something odd was going on.

19.     On April 10, 1997, around noon, an Albuquerque doctor telephoned several local officials and Kirkeminde to report that Defendant Ryan was in distress and needed assistance. Emergency services went to the bunkhouse, and Ennist also responded.  They could not locate Ryan. They began searching the surrounding area, but then received word that Ryan was being transported to the hospital in Albuquerque.

20.     Later that day, Smith and Ennist searched the bunkhouse for sources of toxins.  While searching vents and cabinets, Ennist saw three videotapes lying outside of a garbage bag.  The label

on one tape indicated it contained home improvement footage. Ennist believed the tape might show whether or how environmental toxins were being introduced into the trailer. The officers took the home improvement tape and two other tapes, labeled "XXO" and "XXX," to the Sheriff's Office to view them.

21.     The first few minutes of the home improvement videotape showed Cashman, Ryan, and Kirkeminde working on the bunkhouse. Then the angle changed, such that the image appeared from the vantage point of a floor vent in the bathroom. The footage showed Cashman getting out of the shower. At this point, the officers suspected Ryan might be a "peeping tom."

22.     The officers contacted a Hornocker supervisor, Cecile Costello, and obtained permission to search the common areas of the bunkhouse. Ennist climbed under the trailer and found where the video camera had been mounted to the floor joists, below the bathroom vent.

23.     The officers then contacted Cashman in the hospital to request permission to search the trailer in its entirety. She told them: "Search. Search everything. You guys–somebody needs to find out what's wrong with me. You guys search whatever you want." The officers conducted a thorough search of the bunkhouse and seized additional tapes, showing Ryan engaging in sex acts with Cashman, while Cashman appeared to be cataleptic[8] or unconscious. Ryan contends that the officers seized eight additional videotapes at this time that were inside a black garbage bag under his bed in the trailer and empty drug vials found under his pillow. [Doc. 10, Ex. D, p. 6.]

24.     According to Ryan, on April 12, 1997, Deputy Jeff Hubbel interviewed Ryan about the videotapes. Ryan explained that he and Cashman were involved in an intimate relationship.

---

[8]Catalepsy is defined as "indefinitely prolonged maintenance of a fixed body posture . . . ." Dorland's Illustrated Medical Dictionary (2007 31st ed.), p. 307.

However, Cashman denied ever having a sexual relationship with Ryan during her interview on April 11, 1997. [Doc. 10, Ex. D, pp. 6-7.]

25.     Testimony at trial established that Ryan began regularly dosing Cashman with bear tranquilizers during a period of months continuing through late March 1997.  Traces of bear tranquilizers were found in samples of her hair cut in May 1997. [Doc. 10, Ex. CC, p. 4.] The drugs used in the study to sedate bears were Telazol and Rompun, which are not used for medical purposes in humans, and Ketamine, which is classified as a "dissociative anesthetic," meaning that "[i]t disconnects the mind's perception of what's happening to the body. . . ." (taken from an expert who testified at trial). [Ex. CC, pp. 4-5.]  Ketamine is a derivative of PCP and produces amnesia. [Ex. CC, p. 5.]

### Procedural History

26.     On April 19, 2000, the Assistant Attorney General filed a criminal complaint against Ryan. [Doc. 10, Ex. D, p. 7.]

27.     Initially, Attorney Peter Schoenburg was Ryan's attorney.  He filed a motion to suppress on Ryan's behalf, but on May 31, 2001, Schoenburg filed a motion to withdraw as counsel and Judge Kase appointed the Public Defenders Office.  On July 27, 2001, public defense attorney Lee Deschamps entered an appearance, but withdrew as counsel three months later.  In late October 2001, Daniel M. Salazar ("Salazar") entered an appearance on behalf of Ryan. [Doc. 10, Ex. D, pp. 7-8.]

28.     Jury selection was conducted from July 8-11, 2002.  On July 25, 2002, a jury convicted Ryan of twenty counts of criminal sexual penetration ("CSP") in the second degree, nine counts of criminal sexual contact, one count of aggravated battery, three counts of kidnaping, and one count of attempted criminal sexual penetration.  [Doc. 10, Ex. D, pp. 9-10; Ex. S, p. 2.]

29.     On February 12, 2003, Judge Edmund H. Kase of the Seventh Judicial District Court, County of Catron, entered Judgment, Sentence and Commitment, sentencing Ryan to 33 years of incarceration. [Doc. 10, Ex. A.]

30.     On March 12, 2003, attorney Salazar filed a notice of appeal, [Doc. 10, Ex. B], and subsequently, an amended notice of appeal on March 14, 2003. [Doc. 10, Ex. C.]

31.     On April 28, 2003, attorney Salazar filed a docketing statement in support of Ryan's appeal. [Doc. 10, Ex. D.] Ryan appealed the following rulings: initial state court order denying his motion to suppress evidence seized as part of a warrantless search, and all other evidence seized as part of "the fruit of the poisonous tree;" state court order denying amended motion to suppress evidence; state court order denying his motion for a new trial based on jury and prosecutorial misconduct; and the judgment and sentence entered in this case.   [Doc. 10, Ex. D.]

32.     Based on Ryan's docketing statement, the only issue raised on appeal that relates to the federal habeas petition is his allegation that the State withheld exculpatory evidence in the form of a missing page from Cashman's diary. [Doc. 10, Ex. D, p. 14.]

33.     On June 16, 2003, Ryan's appeal was assigned to the Court of Appeals' General Calendar. [Doc. 10, Ex. E.]  On February 16, 2006, the Court of Appeals denied Ryan's appeal. [Doc. 10, Ex. J.]

34.     On March 15, 2006, Ryan filed a Petition for Writ of Certiorari in the New Mexico Supreme Court. [Doc. 10, Ex. K.] He argued that "this [is the] story of either an unspeakable sex crime [where Ryan drugged Cashman over a seven-month period and raped her 41 separate times], or a hunch-based, scoff-law vigilante justice." [Doc. 10, Ex. K, p. 1.]

35.     Ryan's Petition for Writ of Certiorari presented the same arguments raised on direct appeal, particularly with respect to the warrantless search of Ryan's room in the trailer.  [Doc. 10,

Ex. K, p. 3.] Ryan also asserted that "from the start," he "admitted to having an intimate sexual relationship with Ms. Cashman.  "They were in fact engaged to be married.  He overtly made videotapes of their sexual encounters." [Doc. 10, Ex. K, p. 4.]

36.     In arguing that his motions to suppress were improperly denied, Ryan also contended that the officers seized hundreds of tapes from the trailer, kept the ones they wanted that fit their theory of the case, and discarded many others that Ryan believes were exculpatory – "showing things like he and Jenny having breakfast in bed together, joyously, and laying on the bed with their dog, talking about their life together, cooking food together, and planning their wedding." [Doc. 10, Ex. K, p. 9.]

37.     On March 29, 2006, the State filed its response to Ryan's petition for writ of certiorari. [Doc. 10, Ex. L.] The State disagreed with Ryan's statement of the facts, contending instead that Ryan became "obsessed" with Cashman.  According to the State, Ryan said he loved Cashman and wanted to marry her, but Cashman said  she was not attracted to him and told him so, "trying to be nice." [Doc. 10, Ex. L, pp. 1-2.] Ryan rigged a video camera under the trailer floorboards and filmed Cashman taking showers.  He surreptitiously drugged Cashman with bear tranquilizers.  While Cashman was unconscious from the drugs, he fondled and raped her, filming himself and Cashman all the while.  The State relied on a physician with expertise in toxicology who viewed some of the tapes and described Cashman as "comatose" and in a twilight state known as "catalepsy." [Ex. L, p. 2 (*citing* Trial Transcript of 7/15/02, at 87-88).]

38.     The State noted that Ryan did not challenge the sufficiency of the evidence against him on any count. [Doc. 10, Ex. L, p. 3.]

39.     On April 7, 2006, the New Mexico Supreme Court entered an Order denying the petition for writ of certiorari. [Doc. 10, Ex. M.]

40.     On July 6, 2006, Ryan filed a petition for writ of certiorari with the United States

Supreme Court. [Doc. 10, Ex. N.] The petition focused on whether the state court's ruling violated

the Fourth Amendment with respect to the warrantless search.  On August 3, 2006, the State filed

its response. [Doc. 10, Ex. O.] On October 2, 2006, the Supreme Court denied Ryan's  petition for

writ of certiorari. [Doc. 10, Ex. P.] A mandate was issued on October 16, 2006. [Doc. 10, Ex. Q.]

41.     On August 6, 2007, Ryan, acting *pro se*, filed a habeas petition in state court. [Doc.

10, Ex. R.] In the state habeas petition, Ryan argued that:  the state deliberately withheld two of the

confiscated videotapes and did not turn them over to Ryan upon his request for discovery; the two

suppressed tapes were exculpatory, depicting Ryan and Cashman engaging in voluntary and

consensual sex; the two withheld tapes would have proven the State's theory of the case was false

and would have contradicted witness statements at trial; the state withheld one page of a three page

letter between Cashman and Kate Kelly that spoke of the pending marriage between Cashman and

Ryan and their allegedly satisfying sex life; the State's failure to disclose these materials violated

Brady; the State submitted false and tampered-with evidence in violation of Ryan's due process

rights; tapes were altered that allegedly showed Ryan originally suffered from the same

environmental toxins as Cashman; Ryan was denied due process by the State's use of inadmissible

and unproven scientific evidence; the expert witness relied upon by the State was allowed to employ

unproven scientific testing that is not accepted by scientific community, in contrast with "regular

and accepted gas chromatography/mass spectrometry tests;" and the trial court denied Ryan's

request for funds to hire a defense expert to challenge the State's expert.

42.     Ryan also claimed ineffective assistance of counsel based on a number of grounds,

including: Salazar believed Ryan was guilty and thus, did very little to defend the case; Salazar did

nothing to locate the two missing videotapes; Salazar and the defense investigator refused to allow

Ryan to view all evidence, including tapes, prior to trial; Salazar failed to investigate Cashman's diary while untruthfully arguing the State suppressed the diary; Salazar failed to investigate a romantic vacation Ryan and Cashman took to Yellowstone National Park; Salazar failed to investigate a missing page of a letter between Cashman and Kate Kelly; Salazar failed to investigate the "couple's" friends who could have testified about the "mutual and loving relationship" between Cashman and Ryan; Salazar failed to investigate and become knowledgeable about the State's expert witness and related evidence; Salazar did not understand that Dr. Fisher examined Cashman and Ryan and concluded both suffered from carbon monoxide poisoning; Salazar failed to ensure that Dr. Walls would be able to testify on behalf of Ryan and did not understand that Dr. Walls' expertise and testimony would have refuted the State's "junk science;" Salazar obtained a court order to get Cashman's psychological records but then did not get those records; Salazar did not allow Ryan to participate in his own defense and refused to provide discovery to Ryan; Salazar failed to investigate, even after he knew the State tampered with evidence; Salazar's failure to investigate prejudiced the chosen defense theory and failed to provide available impeachment evidence; and Salazar repeatedly attempted to cross-examine witnesses at trial with the wrong evidence.

43.     According to the Answer [Doc. 10, p. 10], State District Court Judge Kase (the same judge who presided over the criminal proceeding) appointed habeas counsel for Ryan and ordered appointed counsel to file an amended state habeas petition, which was filed on June 11, 2008. [Doc. 10, Ex. S.]

44.     In the amended state habeas petition, counsel for Ryan argued generally that Ryan was innocent and denied his state and federal constitutional right to due process and a fair trial because of ineffective assistance of counsel and prosecutorial misconduct. [Doc. 10, Ex. S, p. 1.] With respect to the ineffective assistance of counsel claim, Ryan argued Salazar failed to conduct

11

an adequate and independent defense investigation, failed to effectively challenge the State's scientific evidence, and failed to present expert evidence to rebut the State's scientific evidence. But for those errors, Ryan contended there was a reasonable probability that the result of the proceeding would have been different, *i.e.,* Ryan would not have been convicted of the charges. [Doc. 10, Ex. S, p. 6.]

45. More specifically, the amended state habeas petition set forth the following grounds of alleged ineffective assistance of counsel: lack of adequate pretrial investigation into Cashman's only viable defense theory – that Cashman consented to the sexual relationship with Ryan and consented to the taping of their sexual encounters; failure to secure Cashman's psychological records, in view of the trial court's ruling allowing counsel to obtain these records, particularly when Cashman's psychological state was crucial to the defense theory of consent; failure to investigate and obtain psychological records that could have inferred that Cashman was unable to participate in sexual relations with Ryan unless "she numbed her conscience into a virtual state of unconsciousness;" failure to investigate and interview percipient witnesses who could have testified to the consensual nature of the parties' relationship, the romantic vacation taken together to Yellowstone, their plans for marriage, and observations of the couple being mutually in love; failure to investigate Cashman's diary when the diary contained information about marriage plans Cashman had with Ryan; erroneous statement that the State suppressed the diary; and failure to investigate two exculpatory videotapes and a missing page from a letter between Cashman and Kate Kelly.

46. The amended state habeas petition also argued that trial counsel was ineffective for failing to pursue potentially meritorious pretrial motions, *e.g.,* a motion in limine to exclude the State's expert scientific evidence regarding Cashman's hair samples and to argue the scientific technique relied upon by the State was not accepted or recognized in the scientific community;

12

motion in limine to exclude scientific results from the hair samples; motion in limine to challenge integrity of the hair samples that were tested; and motion in limine to exclude the State's expert from testifying because the scientific evidence upon which he relied was inherently unreliable.

47.     Ryan also argued counsel was ineffective for failing to retain an expert witness who would rebut scientific evidence presented by the State's expert and failing to have a previously contacted expert evaluate the State's scientific evidence.  In addition, counsel was ineffective by failing to make the expert available to the State so it could interview him within a reasonable time before trial and failing to preserve the issue for appellate review by making an offer of proof as to Ryan's expert's testimony.  Counsel was also ineffective for failing to challenge the trial court's denial of funds to hire a defense medical expert.

48.     Ryan further contended that counsel was ineffective by failing to keep him informed of the status of the case and failing to respond to Ryan's letters, requests for discovery, and telephone calls.  Ryan argued that the many errors by counsel constituted cumulative error.

49.     The amended state habeas petition also argued the State engaged in prosecutorial misconduct by failing to disclose the two exculpatory videotapes and one page of a three-page letter between Cashman and Kate Kelly concerning the pending marriage between Cashman and Ryan. Ryan asserted that the State edited the videotapes shown to the jury in such a way that unfairly prejudiced his defense, *i.e.*, by removing all footage showing that Ryan suffered from degraded motor skills and impaired consciousness, similar to Cashman.  Ryan again contended that multiple instances of prosecutorial misconduct constituted cumulative error.

50.     Ryan argued that he was actually innocent of the offenses and that if the evidence of the two missing videotapes had been introduced, no reasonable jury would have convicted him of the offenses.

13

51.     Ryan further asserted that his appellate attorney was ineffective by failing to support arguments on two issues: that a witness for the State was improperly allowed to sit at counsel table as the State's lead investigator despite having supervised the jury venire prior to impanelment; and that the court improperly excluded evidence tending to show Ryan's poor health.  Appellate counsel allegedly failed to properly support these arguments; thus they were not considered on appeal.

52.     On November 24, 2008, the State filed a response to the amended state habeas petition. [Doc. 10, Ex. T.]

53.     On February 4, 2009, Judge Kase wrote counsel of record informing them that an evidentiary hearing was not required in this matter and that Petitioner could file a reply. [Doc. 10, Ex. U.]

54.     On March 2, 2009, counsel for Ryan filed a response to "the Court's Proposed Order Denying Petition for a Writ of Habeas Corpus," [Doc. 10, Ex. V], arguing that he was entitled to an evidentiary hearing.

55.     On March 9, 2009, Judge Kase wrote counsel noting that it appeared Ryan's March 2, 2009 letter indicated counsel's belief that the court already denied the amended state habeas petition.  Judge Kase explained that his earlier letter informed counsel that he would not decide the petition until briefing was completed.  The trial court permitted the State to respond to Ryan's March 2, 2009 pleading and Ryan's attorney to file a reply. [Doc. 10, Ex. W.]

56.     On March 30, 2009, the State filed a response to the March 9, 2009 pleading. [Doc. 10, Ex. X.]

57.     On April 28, 2009, Ryan filed a reply, arguing that trial counsel failed to adopt any defense at all and was "simply present" at the trial. [Doc. 10, Ex. Y.] On August 12, 2009, Judge Kase issued a letter stating it reviewed all the pleadings, and concluded that the case did not warrant

14

a hearing.  Judge Kase dismissed the amended state habeas petition on the basis of the arguments

and authorities set forth in the State's response and directed the State to submit an appropriate order.

[Doc. 10, Ex. Z.]

58.     On September 9, 2009, Judge Case entered a Final Order on Ryan's "Petition for Writ

of Habeas Corpus," setting forth why the court declined to conduct an evidentiary hearing and why

dismissal of the amended petition was appropriate. [Doc. 10, Ex. AA.]

59.     On September 22, 2009, Ryan, acting *pro se*, filed a Petition for Writ of Certiorari

in the New Mexico Supreme Court.  Ryan argued that his appointed public defender had abandoned

him and refused to "prosecute the appeal." [Doc. 10, Ex. BB, p. 1.] Ryan continued to argue that the

State withheld two videotapes, that his trial attorney's performance was constitutionally ineffective,

and that the state court should have held an evidentiary hearing on his amended habeas petition  [Ex.

BB, p. 4.]

60.     On November 12, 2009, the State filed a response to the petition for writ of certiorari.

[Doc. 10, Ex. CC.]

61.     On November 13, 2009, the New Mexico Supreme Court denied Ryan's petition for

writ of certiorari. [Doc. 10, Ex. DD.]

## Exhaustion of State Remedies

62.     A federal court may consider a petition for writ of habeas corpus only after the

petitioner first presents his claims to a state court and exhausts state remedies, unless "there is an

absence of available State corrective process or circumstances exist that render such process

ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(A).  The exhaustion

requirement is satisfied if the federal issue has been properly presented to the highest state court,

either by direct review of the conviction or in a post-conviction attack.  <u>Dever v. Kan. State</u>

Penitentiary, 36 F.3d 1531, 1534 (10th Cir. 1994).  The Tenth Circuit also held that a state prisoner does not fully exhaust state remedies without timely seeking certiorari review with the state supreme court.  Barnett v. LeMaster, 167 F.3d 1321, 1323 (10th Cir. 1999) (*citing* Dulin v. Cook, 957 F.2d 758, 759 (10th Cir. 1992)); Watson v. State of New Mexico, 45 F.3d 385, 387 (10th Cir. 1995).

63.     The exhaustion doctrine reflects the policies of comity and federalism between state and federal governments, a recognition that "'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." Demarest v. Price, 130 F.3d 922, 932 (10th Cir. 1997) (*quoting* Picard v. Connor, 404 U.S. 270, 275 (1971)).  The exhaustion doctrine requires the petitioner to "fairly present" his claims to the state courts before a federal court will examine them. Id.  "Fair presentation" of a prisoner's claim means that the "substance of the claim" was raised before the state court either on appeal or in post-conviction proceedings as described above.  Id.

> Therefore, although a habeas petitioner will be allowed to present 'bits of evidence' to a federal court that were not presented to the state court that first considered [her] claim, evidence that places the claims in a significantly different legal posture must first be presented to the state courts.

Id. (internal citations omitted).  Even if the applicant raises the same *legal* claims, e.g., ineffective assistance of counsel, in state and federal proceedings, reliance in the two proceedings upon different *factual* grounds could "fundamentally" alter the legal claim and foreclose an argument of exhaustion.  Cruz v. Warden, 907 F.2d 665, 668-69 (7th Cir. 1990).  As long as the petitioner did not "fundamentally alter" the legal claim already presented to the state court, the claim will be considered exhausted.  *See* Richey v. Bradshaw, 498 F.3d 344, 352-54 (6th Cir. 2007) (finding claim of ineffective assistance of counsel was not "fundamentally altered" from that which was presented to the state court).

16

64.    A state prisoner bringing a federal habeas petition bears the burden of showing he exhausted state remedies.  Hernandez v. Starbuck, 69 F.3d 1089, 1092 (10th Cir. 1995), *cert. denied*, 517 U.S. 1223 (1996); Miranda v. Cooper, 967 F.2d 392, 398 (10th Cir.), *cert. denied*, 506 U.S. 924, 113 S.Ct. 347 (1992).

65.    In cases where a petition brings a federal habeas proceeding containing both exhausted and unexhausted claims, the petition is considered mixed.  Rose v. Lundy, 455 U.S. 509, 510, 522 (1982).  *See* Pliler v. Ford, 542 U.S. 225, 227 (2004).  When a federal district court is presented with a mixed petition, it must "either (1) dismiss the entire petition without prejudice in order to permit exhaustion of state remedies, or (2) deny the entire petition on the merits."  Moore v. Schoeman, 288 F.3d 1231, 1235 (10th Cir. 2002) (discussing requirements of § 2254(b) and Rose, 455 U.S. 509).  In "limited circumstances," a federal court may stay a mixed petition pending exhaustion of state court remedies.  Rhines v. Weber, 544 U.S. 269 (2005).  However, abeyance is appropriate only if the petitioner demonstrates good cause for his failure to exhaust, the unexhausted claims are potentially meritorious and there is no indication that he engaged in intentionally dilatory litigation tactics.  Id., at 277.

66.    A petitioner's other option is to choose to amend the federal habeas petition by dismissing the unexhausted claims, so that an amended federal habeas petition containing only exhausted claims proceeds for resolution.  By doing so, however, a petitioner may likely forego the opportunity to seek federal habeas relief based on the unexhausted claims, even if he later exhausts them in state court.  *See* Hamilton v. Sirmons, 2008 WL 5378324 at *3 (W.D. Okla. Dec. 19, 2008).  This is true because even if the petitioner returns to state court and exhausts the unexhausted claims, the one-year statute of limitations, 28 U.S.C. § 2244(d)(1)(A), may bar the petitioner from bringing the later exhausted claims back to federal court.  The one-year limitations period is not tolled during

17

the time in which a federal habeas petition is pending in a federal district court.  Duncan v. Walker, 533 U.S. 167, 181-82 (2001); York v. Galetka, 314 F.3d 522, 524 (10th Cir. 2003).

67.     Strict enforcement of the exhaustion requirement encourages habeas petitioners to exhaust all of their claims in state court and present a single habeas petition to federal court.  Rose. 455 U.S. at 520.  In so doing, the district court will be more likely to review all of the claims in a single proceeding and provide a more focused and thorough review.  Id.  The total exhaustion requirement "reinforces the importance of Lundy's "simple and clear instruction to potential litigants: before you bring any claims to federal court, be sure that you first have taken each one to state court."  Rhines, 544 U.S. at 276-77 (citing Rose v. Lundy, 455 U.S. at 520).  Exhaustion may be waived if "state procedural snarls or obstacles preclude an effective state remedy against unconstitutional convictions"or if there is an inordinate or unjustifiable delay for which the state is responsible.  Bartone v. United States, 375 U.S. 52, 54, 84 S.Ct. 21 (1963) (per curiam); Lane v. Richards, 957 F.2d 363, 365 (7th Cir.), cert. denied, 113 S.Ct. 127 (1992).

68.     Here, the State agrees that Ryan exhausted most of the claims raised in the federal habeas petition, with the exception of three grounds Ryan asserted in support of ineffective assistance of counsel: (1) Salazar refused to allow Ryan to review evidence or videotapes before trial because counsel believed Ryan was guilty [Doc. 1, subclaim (i)]; (2) Salazar did not understand that Dr. Fisher examined both Cashman and Ryan and thus, did not rely on evidence that both Ryan and Cashman suffered from carbon monoxide poisoning [Doc. 1, subclaim (vii)]; and (3) Salazar's failure to investigate prejudiced counsel's ability to effectively cross-examine witnesses at trial [Doc. 1, subclaim (xii)]. [Doc. 10, p. 13.]

69.     As noted by the State, Ryan included all of these grounds in his pro se state habeas petition, but when the State Court assigned him counsel and allowed counsel to submit an amended

18

state habeas petition, the amended petition did not specifically identify these three grounds of ineffective assistance of counsel.  Notwithstanding this possible omission, in Ryan's September 22, 2009 *pro se* Petition for Writ of Certiorari, he stated he was "re-assert[ing] the claims presented in both the original and amended petitions for writ of habeas corpus for this Court's considerations." [Doc. 10, Ex. BB, p. 4.]

70.     The Court concludes that all of the claims/grounds were properly presented to the highest state court in the post-conviction attack.  Even if these grounds were not exhausted in the state habeas petition, there was sufficient overlap among the ineffective assistance of counsel claims to justify finding the "substance of the claims" in question was "fairly presented" to the state court. Stated differently, while some of the factual grounds for alleged ineffective assistance of counsel were not specifically raised in the amended state habeas petition, the evidence or grounds relied upon by Ryan in the federal habeas petition did not place the claims in a significantly different legal posture than those presented to the state court. Alternatively, because the Court determines that none of Ryan's claims have merit and recommends that the entire federal habeas petition be dismissed, complete exhaustion, even if found lacking, is not necessary, 28 U.S.C. § 2254(b)(2).  *See* Fairchild v. Workman, 579 F.3d 1134, 1156 (10th Cir. 2009) (discussing options in handling mixed petition).

## Deference to State Court Adjudications

71.     Ryan's petition is analyzed under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  An application for writ of habeas corpus brought by an individual in custody pursuant to a judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2)

resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceedings.  28 U.S.C. § 2254(d).

> A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one.

Allen v. Mullin, 368 F.3d 1220, 1234 (10th Cir. 2004) (*citing* Bell v. Cone, 535 U.S. 685, 694

(2002)), *cert. denied*, 125 S.Ct. 1301 (2005).  This means that a federal court is precluded from

granting habeas relief, except in the narrow circumstances described in § 2254(d), and that this

Court must apply a presumption that the factual findings of the state court are correct unless the

petitioner can rebut this presumption by clear and convincing evidence.  Smallwood v. Gibson, 191

F.3d 1257, 1264-65 (10th Cir. 1999), *cert. denied*, 531 U.S. 833 (2000).

72.     To justify federal habeas relief, the decision of the state court must not only have

been erroneous, but also unreasonable.  Williams v. Taylor, 529 U.S. 362, 365, 376 (2000); Gipson

v. Jordan, 376 F.3d 1193, 1196 (10th Cir. 2004), *cert. denied,* 546 U.S. 1030 (2005).  "Federal

habeas courts do not sit to correct errors of fact or to relitigate state court trials.  Our jurisdiction is

limited to ensuring that individuals are not imprisoned in violation of the Constitution."  Thompson

v. Oklahoma, 202 F.3d 283 (Table, Text in Westlaw), No. 98-7158, 2000 WL 14404 at *6 (10th Cir.

Jan. 10, 2000) (unpublished), *cert. denied,* 530 U.S. 1265 (2000).

73.     Before reaching Ryan's habeas claims, the Court first determines whether the state

court adjudicated the claims on the merits.  On direct appeal, the New Mexico Supreme Court,

20

thoroughly summarized the factual background of the case and addressed one of the claims raised by Ryan on his federal habeas petition – the claim that the State withheld exculpatory evidence in the form of a page from Cashman's diary.  In his state habeas petitions, Ryan raised all of the claims he asserts in the federal habeas petition.  The Seventh Judicial District Judge appointed counsel for Ryan in his state habeas petition and required complete briefing of the issues.  Judge Kase dismissed the state habeas petition, after reviewing all of the pleadings.  In so doing, Judge Kase stated that Ryan's amended state habeas petition was dismissed "on the basis of the arguments and authorities set forth in the State's responses." [Doc. 10, Ex. Z, p. 2.] The State's responses [Doc. 10, Exhs. T, X], and in particular, its initial response [Ex. T], provided extensive analysis as to each claim Ryan raised.

74.     Even if the state court's denial of Ryan's state habeas petition is viewed as summary, a court's summary dismissal of a habeas petition constitutes an adjudication on the merits.  Aycox v. Lytle, 196 F.3d 1174, 1177-78 (10th Cir. 1999) (affording deference under the AEDPA to state court's rejection of claim's merit, despite lack of any reasoning); Weeks v. Angelone, 176 F.3d 249, 259 (4th Cir. 1999), aff'd, 528 U.S. 225 (2000) (same).  See also Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998) (refusing to presume that a summary order indicated a cursory or haphazard review of a petitioner's claims).

75.     The Court concludes that the claims Ryan raises in this federal habeas proceeding were adjudicated on the merits in state court and are, therefore, subject to review under the standard set forth in 28 U.S.C. § 2254(d).

**Analysis**

## I.    DUE PROCESS VIOLATIONS/WITHHOLDING BRADY EVIDENCE

76.     "The prosecution's suppression of evidence favorable to the accused . . . violates due process where the evidence is material either to guilt or to punishment." United States v. Williams, 576 F.3d 1149, 1163 (10th Cir. 2009), *cert. denied*, 130 S.Ct. 1307 (2010); United States v. Erickson, 561 F.3d 1150, 1162 (10th Cir.) (*citing* Brady v. Maryland, 373 U.S. 83, 87 (1963), *cert. denied*, 130 S.Ct. 173 (2009). "To establish a Brady violation, [Ryan] must prove that the [State] suppressed evidence, the evidence was favorable to the defense and the evidence was material." Williams, 576 F.3d at 1163.  Evidence is material for Brady purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id.; *see also* United States v. Velarde, 485 F.3d 553, 559 (10th Cir. 2007). A reasonable probability, in turn, is a "probability sufficient to undermine confidence in the outcome." Williams, 576 F.3d at 1163.

77.     Ryan claims that the State's deliberate withholding of two of thirteen videotapes from evidence violated his due process rights.  He also alleges that the State withheld one page of a letter between Cashman and her friend Kate Kelly, in violation of his due process rights.  Ryan identifies Brady as the "clearly established federal law" applicable to these due process claims.

78.     More specifically, Ryan contends the prosecution failed to disclose two exculpatory videotapes that showed him and Cashman engaging in consensual sexual acts.  These two tapes, according to Ryan, would have contradicted the State's theory that Ryan drugged Cashman and then raped her while videotaping the incidents. [Doc. 1, pp. 6, 6a.]

79.     It is unknown whether the State suppressed two of the thirteen tapes or failed to produce them upon Ryan's request before trial.  However, even if two tapes were suppressed, Ryan

22

has not demonstrated that the evidence on those tapes was favorable to him or material to his defense. Ryan argued that these two tapes would have shown Cashman engaged in consensual sex with him. There are two problems with Ryan's argument. First, at the time of his trial and conviction, New Mexico law did not recognize a "consent defense" to the charges of criminal sexual penetration. *See* Doc. 10, Ex. T, p. 5 (noting that as of 1975, the New Mexico Legislature abolished the common law-derived crime of "rape" and drafted the criminal sexual penetration statute to eliminate lack of consent as an element; in 2006, years after Ryan's trial, new jury instructions effectively reinstated lack of consent as an essential element of most sexual crimes in New Mexico). *See also* State v. Jensen, 138 N.M. 254, 260 (Ct. App.) (noting that New Mexico courts have long held that absence of consent is not an element of the crime of CSP) (*relying on* State v. Gillette, 102 N.M. 695, 700 (Ct. App. 1985), which held that "the defense of consent is not available to defendant because lack of consent is not an element of [CSP])," *cert quashed,* 138 N.M. 587 (2005). Thus, even if the tapes could be interpreted to show Cashman "consented" to sex with Ryan, the legal defense of consent was unavailable at the time of Ryan's trial and conviction.

80.     Second, evidence at trial showed that one effect of the powerful bear tranquilizers on human beings was to turn them into "poseable dolls." Thus, tapes showing Cashman purportedly "consenting" to sex with Ryan would not necessarily mean she intentionally had sex with Ryan under her own volition. As argued by the State (and adopted by the State Court), videotaped acts could not evidence conscious mental processing, especially when powerful animal sedatives were utilized.

81.     In addition, Ryan has not shown that footage from these two videotapes was material to his defense, in part for the reasons stated above, i.e., consent was not a cognizable defense to the charges at that time. Moreover, Ryan has not demonstrated that had the evidence been disclosed

to the defense, the result of the criminal proceeding would have been different.  This is particularly true because there were eleven other videotapes apparently unfavorable to Ryan, yet they too demonstrated the couple having "sex."  Ryan stated in his amended brief-in-chief on direct appeal that in the "remaining dozen or more" videotapes introduced into evidence showing their "sexual encounters," Cashman appeared "awake, lucid, in motor control, participating in sex and sexually aroused." [Doc. 10, Ex. G, p. 6.]  Thus, it appears that the two "undisclosed" tapes provided no different evidence than that presented to the jury and that they would have been merely cumulative evidence.  Cumulative evidence is not considered material for <u>Brady</u> purposes.  <u>United States v. Page</u>, 828 F.2d 1476, 1479 (10th Cir.), *cert. denied,* 484 U.S. 989 (1987).

82.    With respect to the undisclosed or missing page of the three-page letter between Cashman and friend Kate Kelly, Ryan claims the page spoke of the pending marriage between him and Cashman, as well as the "intimate satisfying and vigorous sex life" they shared. [Doc. 1, p. 6a.] According to the State, whose argument was relied upon by the state habeas judge, the jury heard a "great deal of evidence about the short-lived engagement, beginning with the prosecution's opening statement, continuing with defense counsel's opening, the direct examination of . . . Margaret Kirkeminde, defense's cross-examination of . . . Kirkeminde, and so on, leading up to Ms. Cashman's own revelatory testimony about how [Ryan] manipulated and drugged her to get her to agree to the engagement." [Doc. 10, Ex. T, p. 30] (citations to the record proper omitted); [Doc. 10, Ex. H, p. 1].

83.    For reasons similar to those stated above, the Court concludes that any evidence included in the "missing page" of the letter was not necessarily favorable and clearly was not material.  In other words, even if marginally favorable to Ryan, there is no showing of a reasonable

24

probability that the outcome of the criminal proceeding would have been different based on additional cumulative evidence.

84.     The state trial court's conclusion was neither contrary to, nor an unreasonable application of, Brady.

## II.     DUE PROCESS VIOLATION/TAMPERING WITH EVIDENCE

85.     Ryan contends that he was denied due process when the State allegedly tampered with the videotapes shown to the jury by removing "all instances that illustrated [Ryan] suffering degraded motor skills and impaired consciousness" similar to Cashman's symptoms.  The Court interprets this claim as yet another alleged Brady violation.  Thus, Ryan must show that evidence at issue (omitted footage in videotapes) was both favorable to the defense and material.

86.     The State argued that the testimony at trial was replete with evidence that Ryan portrayed himself as suffering from the same environmental toxins as Cashman.  Evidence was presented at trial, for example, that a doctor from Albuquerque called down to Catron County reporting Ryan had "crashed" and needed immediate medical attention.  Evidence was admitted showing Ryan was transported to an Albuquerque hospital that day as well.  The state judge accepted and relied on this argument by the State in denying the state habeas petition.

87.     Because the purported tampered-with evidence is nothing more than cumulative in effect, Ryan cannot demonstrate the evidence was material under Brady.

### III.    DUE PROCESS VIOLATION/STATE'S USE OF INADMISSIBLE AND UNPROVEN SCIENTIFIC EVIDENCE[9]

88.    Ryan claims he was denied due process by the State's use of allegedly inadmissible and unproven scientific evidence that was not accepted by the scientific community.   More specifically, Ryan argues that the "test used by the prosecutor allegedly provided detection of such minute amounts of the drugs that at such levels would have no effect on a human being."  [Doc. 1, p. 9a.] Ryan also contends that the trial court improperly denied his request for funds[10] to hire a defense expert to attempt to evaluate "the state's junk science." [Id.] Thus, this claim might also be read to include the argument that the state court erroneously admitted unqualified expert testimony.

89.    In considering a claim of prosecutorial misconduct on federal habeas review, the question is whether the prosecutor's conduct was so egregious as to render the entire proceedings fundamentally unfair.  Short v. Sirmons, 472 F.3d 1177, 1195 (10th Cir. 2006) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 642-48, 94 S.Ct. 1868 (1974), cert. denied, 552 U.S. 848 (2007)); see also Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940 (1982) (touchstone of due process analysis in alleged prosecutorial misconduct is fairness of trial, not culpability of prosecutor).  Federal habeas relief addresses only egregious misconduct that would amount to a constitutional denial of due process.  Smith, 455 U.S. at 221.

90.    It is not entirely clear whether Ryan attacks the admissibility of the State's expert witness's testimony, the testing methods used by the State's expert, the State's reliance on its expert, or all of the above.  Ryan states that "regular, and accepted, gas chromatography/mass spectrometry

___

[9]This claim overlaps with Ryan's ineffective assistance of counsel claim regarding his attorney's failure to file a motion in limine to prevent Dr. Middleberg from testifying. [Doc. 10, Ex. T, p. 15.]

[10]Ryan made no showing that he was denied funds to hire an expert to challenge the State's expert.  Rather, his attorney stated that the expert with whom defense counsel consulted did not disagree with the State's expert.

tests done on Jennifer Cashman's hair samples proved negative for animal tranquilizers, phencyclidine (PCP), and Ketamine. The gass [sic]/mass test is accurate to the 1/1,000,000,000th of 1 gram . . . level. And, this test regularly detects human drug use at these levels. The new test cannot be reproduced."

91.     Ryan was free to make all of the above-stated arguments at his trial, to the extent that such expert testimony was found admissible under the pertinent legal standards. It is undisputed, however, that the trial court found admissible the testimony of the State's expert chemist, Dr. Robert Alan Middleberg, that bear tranquilizer metabolites were present in Cashman's hair. [Doc. 10, Ex. CC, p. 24.] Ryan identified his defense expert as Dr. Walls. Instead of calling Dr. Walls to testify, Ryan's attorney stated that Dr. Walls "says many of the same things as . . . Dr. Middleberg . . . .He's in the same vein as Dr. Middleberg, and may agree with him on every point . . . ." [Doc. 10, Ex. CC, p. 25] (internal citation omitted).

92.     Thus, while Ryan makes arguments about the scientific evidence and what types of scientific evidence were allegedly accepted by the scientific community, his arguments are unsubstantiated. Ryan was not qualified as an expert. Clearly, the trial court found Dr. Middleberg qualified as an expert witness by his knowledge, skill, experience, training, or education. *See* Fed. R. Evid. 702. Ryan provides no evidence to refute Dr. Middleberg's qualifications as an expert witness. Moreover, defense counsel admitted that his own expert did not contradict Middleberg's conclusions or testing.

93.     Ryan fails to show that testimony by Dr. Middleberg, a recognized expert in his field, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." This is particularly true because there was no shortage of evidence at trial that Cashman had been drugged. This included her own testimony, her symptoms, multiple instances of medical treatment,

and particularly, the videotapes Ryan took that depicted her in some footage as comatose or cataleptic.  The State argued that Dr. Middleberg's testimony was just one brick at the very top of an imposing wall of evidence.  Removing it would have made no practical difference." [Doc. 10, Ex. T, P. 20.]

94.     The state habeas court relied on the State's argument and reasoning in denying the habeas petition.  Ryan failed to identify "egregious misconduct that would amount to a constitutional denial of due process" or that the State's reliance on admissible expert testimony rendered the entire criminal proceeding "fundamentally unfair."

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

95.     The United States Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984) governs the inquiry of whether an attorney's performance was ineffective.  In order to establish a claim of ineffective assistance of counsel, Ryan must show both that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that he was prejudiced because counsel's errors rendered the outcome of the state court's proceedings unreliable.  <u>Id.</u>  In applying the test of whether an attorney's performance was deficient and fell below an objective standard of reasonableness, the Tenth Circuit advises that "we give considerable deference to an attorney's strategic decisions and 'recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"  <u>Bullock v. Carver</u>, 297 F.3d 1036, 1044 (10th Cir.) (internal citation omitted), *cert. denied*, 537 U.S. 1093 (2002).  In order to be found constitutionally ineffective, trial counsel's performance must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy. <u>Hoxsie v. Kerby</u>, 108 F.3d 1239, 1246 (10th Cir.), *cert. denied,* 522 U.S. 844 (1997).

28

96.     The question under <u>Strickland</u> is not whether counsel could have done more or even better, but whether counsel's actions or decisions were "[objectively unreasonable] in all the circumstances, applying a heavy measure of deference to counsel's judgments." <u>Strickland</u>, 466 U.S. at 691.  In other words, Ryan may not have received the best or perfect legal representation at every step of the proceeding, but a defendant is not entitled to perfect or error free representation. <u>Washington v. Watkins</u>, 655 F.2d 1346, 1357 (5th Cir. 1981), *cert. denied*, 456 U.S. 949 (1982); <u>United States v. Rhoads</u>, 617 F.2d 1313, 1319 (8th Cir. 1980); <u>Martinez v. U.S.</u>, 2008 WL 2329171, *5 (D. Utah June 3, 2008) (unpublished).  The Court does not indulge in the "distorting effects of hindsight" which would be contrary to what Strickland attempts to eliminate.  <u>Strickland</u>, 466 U.S. at 689.

97.     Before reaching Ryan's claims of ineffective assistance of counsel, the Court observes that most, if not all of these claims, could be summarily denied.  That is true because Ryan attempts to relitigate issues or alleged trial errors that either were or should have been raised on direct appeal.  For example, allegations concerning missing videotapes are improperly recast here as claims of prosecutorial misconduct and ineffective assistance of counsel.  Yet, if videotapes were missing, who better to know that than Ryan, the videographer.  Because he made all of the videotapes, he could have raised the issue during trial as well as on direct appeal.  Similarly, Ryan knew of the "romantic vacation" he took with Cashman to Yellowstone and that too could have been raised on direct appeal.  He supposedly knew of the friends or witnesses who would have testified that Ryan and Cashman were a "loving couple" and planned to marry.  Thus, he could have raised all of these issues during trial or on direct appeal.  Before trial, Ryan actually did assert a claim of ineffective assistance of counsel as to Salazar's alleged lack of preparation for trial and failure to

turn over discovery to Ryan.  The trial court denied his motion for extension of time and substitution of counsel.[11]

98.    So, too, Ryan was well informed of issues regarding medical experts, scientific evidence, and Salazar's failure to use an expert at trial because these claims were raised on appeal, *albeit* under the guise of trial court errors.  *See, e.g.,* Doc. 10, Ex. G (Appellant's Amended Brief-in-Chief), at pp. 2-3.

> [T]he trial court slanted the trial by a series of rulings: . . . (b) refusing to let defense counsel interview the state's lead expert witness; (c) excluding the defense's expert doctor witness from testifying altogether; and (d) excluding from the trial evidence of Ryan's impaired health and heart damage, which tended to corroborate his defense.

[Doc. 10, Ex. G, pp. 2-3; *see also*, pp. 30-32.] The New Mexico Court of Appeal rejected the arguments. [Doc. 10, Ex. J, pp. 19-22.]

99.    "[C]laims of ineffective assistance of counsel are not designed to allow defendants to relitigate trial errors that should have been raised on direct appeal.  State habeas petitioners, in particular, are not allowed to bring their state trial court errors into federal court under the guise of catch-all ineffective assistance of counsel claims." Boyle v. McKune, 544 F.3d 1132, 1138 (10th Cir. 2008) (*relying on* 28 U.S.C. § 2254(a) which notes that a federal court entertains a federal habeas petition on behalf of a state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"), *cert. denied,* 129 S.Ct. 1630 (2009). Notwithstanding Ryan's attempts to relitigate claims that were already decided or that could have been raised earlier, the Court addresses the ineffective assistance of counsel claims.

---

[11]In the appellate docketing statement, Ryan notes that before his trial began he claimed Salazar was not prepared to go to trial and that Salazar did not provide Ryan with discovery as requested.  Judge Kase denied Ryan's motion for extension of time and ruled against his motion for substitute counsel based on alleged ineffective assistance of counsel. [Doc. 10, Ex. D, p. 8.]

100.     Ryan claims Salazar was provided constitutionally ineffective assistance of counsel on 17 different grounds.   In its analysis, the Court divides the grounds into three categories and combines interrelated grounds supporting the claim of alleged ineffective assistance of counsel.

***Section I:        Failure to Investigate***

101.     Ryan alleges that multiple instances of Salazar's alleged failure to investigate the case constituted ineffective assistance of counsel.   Because Salazar allegedly believed Ryan was guilty, Salazar failed to locate two missing videotapes and refused to allow Ryan to view all the evidence before trial, refused to allow him to participate in his defense, and refused to provide all discovery to him (grounds i, xi (in part), xiii).   In addition, Salazar did not read Cashman's diary, which contained passages concerning a planned marriage between Ryan and Cashman.   To cover up this error, Salazar claimed in his docketing statement that the State suppressed the diary (grounds ii, xiv (in part)).[12]   Salazar failed to investigate a "romantic vacation" taken by Ryan and Cashman to Yellowstone National Park, and failed to interview witnesses who observed the "couple's mutual love" (grounds iii, xiv (in part)).   Salazar failed to investigate a missing page of a letter between Cashman and friend Kelly that discussed marriage with Ryan (ground iv).   Salazar failed to interview friends of the couple who would have testified to the "mutual and loving relationship between Cashman and Ryan" (grounds v, xiv (in part)).   Once alerted to the State's tampering with videotapes, Salazar failed to investigate (ground xi).   Failure to allow Ryan to participate in his

---

[12]This is incorrect.   There was no allegation that the State intentionally suppressed or withheld the missing page.   Rather, it appears that the State inadvertently failed to produce the page, but that during trial, counsel discovered the missing page.   The appellate docketing statement, prepared by Salazar, explained that during trial, counsel discovered the State provided an incomplete copy of Cashman's diary.   [Doc. 10, Ex. D, p. 10.] Ryan argued then that the missing page was vital to the case because it was evidence of the "romantic relationship" he had with Cashman.   The docketing statement further described the missing page as stating: "Called my folks before I talked to D on the 23rd told them P (Patrick Ryan) and I would get married soon."   In response to a motion for new trial, the State argued that the missing page was discovered during trial and therefore, no prejudice resulted to Ryan. [Id.]

defense "exacerbated all of counsel's errors." The result of the trial would have been different but for Salazar's failures (ground xvii).

102.     The underlying premise of all the grounds supporting Ryan's failure to investigate claim is that evidence showed Cashman consented to a sexual relationship with Ryan, consented to a romantic involvement with him, and consented to marry him. This was the defense's theory at trial. However, Ryan contends that additional evidence would have bolstered the consent theory, including a letter between Cashman and a friend, Cashman's diary, and two missing videotapes. In addition, Ryan asserts that witnesses and friends would have testified accordingly, i.e., that Ryan and Cashman appeared to be a "loving couple." Indeed, in his amended state habeas petition, Ryan (through appointed habeas counsel) summed up his defense as follows: "the only viable defense theory was to argue consent," [Doc. 10, Ex. S, p. 7], *i.e.,* that Cashman consented to Ryan making the videotapes.[13] "After the tapes were deemed admissible, it was clear that a jury would require some rational context for a consent defense to be credible." [Id.]

103.     Ryan's unfounded premise failed to consider the effects of the drug tranquilizers used on bears that the jury found Ryan administered to Cashman on many occasions, and testimony that Cashman was hospitalized a number of times, that she nearly died, and that her symptoms ultimately were not explained by anything but the sedatives used on bears that were available to Ryan.

---

[13]Ryan explained in his amended appellate brief that he made videotapes of the sexual encounters with Chapman "for watching later, for fun." [Doc. 10, Ex. G, p. 6.] Part of his defense was that he and Cashman enjoyed watching sex on film, as evidenced by commercially-produced adult sexual videos found in the trailer.

104.    Ryan stretched his theory a little further.  He claimed "the only viable defense strategy was to link Ms. Cashman's strong religious beliefs to her notions of *secondary virginity.*"[14] [Doc. 10, Ex. S, p. 7.]

> The defense could have argued that Ms. Cashman was unable to reconcile her conscious desire for relations with Mr. Ryan with her religious beliefs and consequently agreed to participate in the taped sexual acts.  The expressed inference would have been that Ms. Cashman (because of her psychological makeup), was unable to participate in sexual relations with Mr. Ryan unless she numbed her conscience into a virtual state of unconsciousness.

[Doc. 10, Ex. S, p. 8.] This might "take the cake" for the most unbelievable defense theory pursued under such circumstances.  It assumes that Ryan enjoyed having sex with someone whom he believed needed to "numb" herself into "unconsciousness" before engaging in "intimate" or "romantic" relations with him.  The theory defies credulity and insults any reasonable fact finder.

105.    "[T]he defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound trial strategy."  Boyle, 544 F.3d at 1138 (*citing* Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997) (*quoting* Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)).

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.  The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied

---

[14]Although the Court did not find any particularly reliable sources to define the phrase "secondary virginity," in this case,  it seems to imply a person's desire to erase having been violated or raped and to start "anew."  www.google.com ("secondary virginity")

> by the defendant. In particular, what investigation decisions are
> reasonable depends critically on such information.

Strickland, 466 U.S. at 691.

106.    A reasonable investigation would not have included seeking additional evidence showing that Cashman consented to the sexual encounters depicted in Ryan's videotapes.  As stated earlier, there was ample evidence at trial showing Cashman had been drugged, including her own testimony, her symptoms, her failure to remember almost any of the sexual encounters with Ryan, multiple instances of medical treatment and hospitalizations, and particularly, the videotapes Ryan took that depicted her in some footage as comatose or cataleptic.  A reasonable jury would not have believed that Cashman **could have consented** in a comatose state.

107.    Moreover, as stated *supra* at ¶ 79, consent was not a viable legal defense to criminal sexual penetration and related charges at the time of Ryan's trial and conviction.  Thus, to the extent that Salazar decided not to investigate additional possible evidence showing Cashman consented to sexual relations with Ryan, that decision was reasonable, if not wise.  Ryan admitted he repeatedly videotaped Cashman having sex with him, and it was clear she was in a drugged state during some of the footage.

108.    Ryan failed to show that Salazar's alleged failure to further investigate a defense of consent "fell below an objective standard of reasonableness."  This is particularly true, not only because consent was not a valid legal defense to the charges brought against Ryan, but because evidence of the supposedly loving and mutual relationship, planned marriage, and trip to Yellowstone was presented to the jury.  However, the jury did not buy that story.

109.    In addition, while Ryan claimed there were individuals and friends who would have testified that Ryan and Cashman appeared to be a loving couple, Ryan failed to identify any such

individuals or provide affidavit statements of such testimony. [*See* Doc. 10, Ex. S, p. 9] ("witnesses also were available that could have testified regarding their observations about the couple being mutually in-love;" the couple's mutual friends were aware of the existence of a mutual loving relationship . . . .").

110.    Even if Salazar had dredged up every possible shred of evidence tending to show Cashman consented to a sexual relationship with Ryan, such evidence would not have disproved the jury's finding that Ryan repeatedly drugged Cashman into a comatose state with bear tranquilizers.

111.    The Court determines that additional cumulative evidence tending to show Cashman might have consented to sexual relations and agreed to a wedding could not have blunted the effect of the State's wealth of evidence against Ryan.   The evidence included testimony that Ryan surreptitiously rigged a camera to the bottom of the trailer where he and Cashman stayed to take footage of Cashman in the shower, multiple videotapes that Ryan took of them having sex, videotapes of sexual relations where Cashman appeared comatose and in the twilight state known as "catalepsy" in some shots, testimony that Ryan began regularly dosing Cashman with bear tranquilizers for a period of months, traces of which were found in samples of Cashman's hair in May 1997, drugs available to Ryan used to sedate bears that are classified as "dissociative anesthetics" or that produce amnesia, the discovery of drug vials under Ryan's pillow, Cashman's testimony that she could remember only one episode when Ryan apparently drugged her and then behaved inappropriately to her, Cashman's testimony that Ryan drugged her to manipulate her into agreeing to marry her, and testimony that Ryan drugged Cashman's cat, creating a veterinary emergency, to prevent her from attending an out-of-state conference. [Doc. 10, Ex. O, pp. 4-5.]

112.    The Court concludes that Ryan failed to satisfy his burden of demonstrating constitutional errors on the part of trial counsel.   In addition, he did not demonstrate that he suffered

prejudice due to his trial attorney's acts or omissions.  In other words, even if Salazar were found

to have committed errors, Ryan did not show a reasonable probability that "but for counsel's

unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S.

at 694.

### _Section II:_      _Expert Testimony_

113.    A number of Ryan's claims of ineffective assistance of counsel concern Salazar's

failure to challenge the State's expert witness and failure to secure expert testimony to challenge the

State's scientific testimony.  Specifically, Ryan alleges Salazar failed to conduct an investigation

into the State's proffered science and expert witnesses (ground vi).  Ryan asserts that Salazar did

not understand Dr. Fisher examined Ryan and Cashman, concluding that both suffered from carbon

monoxide poisoning (ground vii).  According to Ryan, Salazar did not understand the speculative

science proffered by the State through expert Dr. Middleberg and did not understand that Dr. Walls'

expertise and testimony would have refuted the State's "junk science" (ground viii).  Salazar

allegedly failed to properly ensure the testimony of Dr. Walls at trial, who would have shown Dr.

Middleberg's "new testing methods" were unreliable and that the samples tested were of

"questionable authenticity."   Dr. Walls purportedly would have proven that any chemicals Dr.

Middleberg claimed to have found could not have caused Cashman's loss of memory or loss of

motor control.  Dr. Walls would have shown videotapes of Cashman handling the drugs at issue

incorrectly and spilling them on her hands (ground ix).  Loss of Dr. Wall's expert testimony

deprived the defense of evidence that Ryan did not use drugs to cause or facilitate rape (ground xv).

114.    As noted above, Ryan asserted some of these same claims on direct appeal but

identified them as trial errors.  Stated differently, Ryan contended that the state court denied a key

component of his defense by excluding Ryan's expert, Dr. Walls, from testifying at trial. [Doc. 10,

Ex. G, pp. 31-32.] According to Ryan, the trial court also denied his request to allow Salazar re-interview the State's medical expert, Dr. Fisher. [Id.]

115.    With respect to Dr. Wall's testimony, Salazar explained to the state court that he had tried to reach Dr. Walls on more than one occasion, without success.  However, Salazar further clarified that he did not know that he would need Dr. Walls.  "He says many of the same things as . . . Dr. Middleberg [the State's expert]."  "he's not as great a concern as the State seems to think he is.  He's in the same vein as Dr. Middleberg, and may agree with him on every point . . . ." [Doc. 10, Ex. H, p. 33.]

116.    Dr. Middleberg testified at trial about the quantitative results of laboratory tests of Cashman's blood plasma, urine and hair.  Salazar did not cross-examine Middleberg.  Thus, according to the State, attacking Middleberg's report was not a "key component" of Ryan's defense. [Id.]

117.    Ryan asserts in his federal habeas petition that Salazar failed to learn about or understand the proffered scientific testimony before Dr. Middleberg testified and therefore, could not challenge his testimony.  He further claims that Dr. Walls would have proven Middleberg's testing and results unreliable, notwithstanding Salazar's explanation to the state court that Dr. Walls was essentially "on the same page" as Dr. Middleberg with respect to scientific testing and results. Ryan fails to demonstrate, other than through unfounded self-serving assertions, that Middleberg's testing or testimony was speculative, unreliable, or amounted to "junk science."  He provides no affidavit testimony from Dr. Walls or any other expert that contradicted Middleberg's testing methods and results.

118.    Ryan also argues that Dr. Fisher, another expert, concluded both Ryan and Cashman suffered from carbon monoxide poisoning.  There is no proof supporting Ryan's theory.  While

medical care providers first suspected carbon monoxide poisoning, those suspicions were never confirmed.  Ryan provides no evidence to the contrary.  Indeed, the Court of Appeals found that while doctors initially assumed Cashman's illness stemmed from carbon monoxide poisoning, by April 10, 1997, doctors no longer believed that was true. [Doc. 10, Ex. J, p. 9.] The appellate court noted that while Ryan also claimed he suffered from carbon monoxide poisoning, after doctors concluded otherwise, Ryan gave Cashman's father the key to the trailer to search for other "possible causes." [Id.] Thus, Ryan did not consistently claim he suffered from carbon monoxide poisoning, nor does he explain how Dr. Fisher's testimony to this effect (even if true), would have helped him.

119.    The testimony at trial from a physician with expertise in toxicology was that Cashman appeared "comatose" in some of the videos and "cataleptic" in other video footage. Cashman testified she recalled Ryan drugging her on one occasion.  Short of testifying himself, Ryan presents no evidence to demonstrate he could have contradicted this testimony at trial.

120.    Whether to call an expert witness to testify at trial is a tactical or strategic decision. *See* Boyle, 544 F.3d at 1139 ("[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney.").  *See also* Jones v. Suthers, 130 F. App'x 235, 241 (10th Cir. Apr. 19, 2005) (unpublished) (finding counsel's decision not to call an expert was "one of trial strategy"), *cert. denied*, 546 U.S. 948 (2005).

> Strategic or tactical decisions are presumed correct. Strickland, 466 U.S. at 690 (holding that strategic choices made after a thorough investigation of law and facts are "virtually unchallengeable"). Decisions based on trial strategy only rise to the level of ineffective assistance of counsel if they are "completely unreasonable, not merely wrong, so that they bear no relationship to a possible defense strategy." Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and alteration omitted); see also Valenzuela v. United States, 261 F.3d 694, 699-700 (7th Cir.2001) (holding that "a lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review" (quotation and alteration omitted));

> United States v. Smith, 198 F.3d 377, 386 (2d Cir.1999) ("The
> decision whether to call any witnesses on behalf of the defendant, and
> if so which witnesses to call, is a tactical decision of the sort engaged
> in by defense attorneys in almost every trial." (quotation omitted)).

Id. at 244.

121.    The state habeas judge similarly found that Ryan's ineffective assistance of counsel claims based on arguments concerning expert testimony were unavailing. [Doc. 10, Ex. AA, p. 3.] This finding is particularly compelling as the habeas judge was also the trial judge and observed first hand defense counsel's performance at trial.  See Schriro v. Landrigan, 550 U.S. 465, 476 ("worth noting . . . that the judge presiding on postconviction review was ideally situated to make this assessment because she is the same judge that sentenced Landrigan . . . ."), reh'g denied, 551 U.S. 1177 (2007).  "Counsel's informed decisions regarding tactics and strategy are not subject to second-guessing in habeas corpus." [Id., ¶ 7.] "The facts alleged in the Amended Petition, even if assumed to be true, are challenges to counsel's tactics and strategy, and do not overcome the strong presumption of effectiveness for the reasons set forth in Respondents' Response . . . ." [Id., ¶ 8.]

122.    The State presented evidence during trial that Salazar had interviewed the State's expert on two occasions and had informed the State on at least two occasions that Ryan's proposed expert agreed with the State's expert on most issues and that Salazar did not believe that the proposed defense expert would be particularly helpful. [Doc. 10, Ex. T, p. 17.]  While Salazar did not cross examine Dr. Middleberg at trial, the record showed Salazar was fully informed on the issue of the expert's testimony and that his own expert told him the evidence was scientifically valid. Thus, Salazar was in an unenviable position of not being able to effectively challenge the State's expert.  Moreover, defense counsel made a wise strategic decision not to call Dr. Walls to testify when he knew Dr. Wall essentially agreed with Dr. Middleberg's testimony.

123.     It might be easy in hindsight for Ryan to speculate that his expert could have provided some favorable testimony, but it is just as easy under these circumstances to imagine Dr. Walls would have provided damaging testimony.

> For as easily as one can speculate about favorable testimony, one can also speculate about unfavorable testimony. *See, e.g.,* United States v. Snyder, 787 F.2d 1429, 1432 (10th Cir. 1986) (rebutting defendant's assertion additional testimony would have been helpful by concluding "it is at least as reasonable, and maybe more so, to speculate that the testimony of those witnesses would have damaged defendant's case").

> Although the medical experts may have provided helpful testimony on direct examination, the admissions and qualifications elicited by prosecutors on cross examination may have been damaging. *See, e.g.,* Parker v. Scott, 394 F.3d 1302, 1322 (10th Cir. 2005) (noting that a certain witness not called to the stand "may have been able to corroborate evidence detrimental to" defendant). This is why the decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney.

Boyle, 544 F.3d at 1138-39.  Ryan fails to show how expert testimony would have assisted his defense.  Even if an expert witness could have speculated that Cashman was ingesting bear tranquilizers for recreational use or mishandling them, as Ryan claims, this would only support testimony and videotaped footage that Cashman was virtually unconscious when Ryan repeatedly violated her.

124.     Ryan fails to show that his attorney's representation was unreasonable, that the challenged actions were not sound strategy, or that calling an expert medical witness, under the circumstances of this case, would have bolstered his defense.  Ryan also cannot show the requisite prejudice, even if he could show error by his attorney.  Given the weight of the evidence against him, and the fact that his own expert essentially agreed with the State's expert, there was "no reasonable probability that, had counsel not committed the errors [Ryan] now claims were

committed, the outcome of the case would have been different." *See* Boyd v. Ward, 179 F.3d 904, 915 (10th Cir. 1999) (concluding, after examining "the totality of the evidence," there was "no reasonable probability that the jury would have reached a different verdict."), *cert. denied*, 528 U.S. 1167 (2000).

### *Section III:*     *Failure to Impeach*

125.     These ineffective assistance of counsel claims emphasize Salazar's alleged failures to properly attack or impeach Cashman and to show that she was a consenting party to sexual relations with Ryan.  They are mostly repetitive of claims discussed above, and the Court does not repeat its earlier discussion of claims concerning evidence about Cashman's diary, the missing page of a letter, the missing two videotapes, the "romantic" vacation, possible testimony of witnesses or friends, or alleged tampering with videotapes, etc.  *See* discussion *supra*.

126.     Ryan argues that Salazar failed to secure Cashman's psychological records after obtaining a court order granting him access to them.  These records, according to Ryan, documented Cashman's "transformation from a betrothed wife to an accusing woman manufacturing rape allegations and laying blame on others close to her. . ." (ground x).  Cashman's psychiatric records would have shown her motive "to bring false rape charges upon an innocent man" (ground xvi). Ryan generally asserts that his defense was prejudiced by Salazar's failure to locate and rely upon available impeachment material.  In addition, Ryan contends Salazar was unfamiliar with the case at trial and demonstrated his lack of familiarity by repeatedly attempting to cross-examine witnesses with the wrong documents, names, dates and locations (ground xii).

127.    The premise behind these grounds of ineffective assistance of counsel claims is that if Ryan had obtained Cashman's post-offense psychological records,[15] he could have impeached her with them.  More specifically, he could have demonstrated, through the psychological records, that Cashman voluntarily chose to be drugged with bear tranquilizers to participate in unconscious sex with Ryan.  His theory was that Cashman's "bizarre religious beliefs" and notion of "secondary virginity" explained her supposed desire to have sex with Ryan when she was unconscious or cataleptic.

128.    Even if the psychological records were relevant to the pertinent time frame, Ryan offers nothing but speculation as to what the records contain.  Indeed, he states "[i]t *is believed* these records document Jennifer Cashman's transformation from a betrothed wife to an accusing woman manufacturing false rape allegations. . . ." [Doc. 1, p. 16.] "The records *may speak* to her profound embarrassment and coercion by the Civil Attorney.*" [Id.] (emphasis added).  Clearly, Ryan's conjecture about the contents of the records does not support the ineffective assistance of counsel claim.

129.    Moreover, Salazar made a reasonable strategic choice when he decided not to pursue a defense that involved attacking the victim.  It would have been an extremely risky trial tactic to denigrate Cashman's character with accusations that she manufactured rape allegations after her "transformation from a betrothed wife," in light of evidence that Ryan surreptitiously videotaped her while she showered, repeatedly drugged her before having sex with her, drugged her into consenting to marry him, almost killed her from giving her too much bear tranquilizer, and which

---

[15]In the State's response to the amended state habeas petition, the State surmises that the psychological records at issue were created after the offense since Cashman supposedly sought mental health treatment from professionals specializing in "date rape." [Doc. 10, Ex. T, p. 4.] The reference to date rape indicates Cashman, most likely, obtained therapy after Cashman committed the offenses.

caused multiple hospitalizations due to this drugging.  Under these circumstances, Ryan failed to overcome the presumption that Salazar's strategic choices not to attack Cashman's character were anything but reasonable and sound trial strategy.  *See* <u>Strickland</u>, 466 U.S. at 689.

130.    In addition, while Ryan claims Salazar failed to locate or rely on "available impeachment material," he never identifies the location or content of any such evidence (other than evidence the Court already found was not material, allegedly tampered with videotapes, missing videotapes, missing page of letter, etc.)  Ryan makes no showing of how any specific evidence would have successfully impeached a certain witness at trial.  Instead, he makes only conclusory statements without any factual basis.  He also argues that Salazar repeatedly cross-examined witnesses with the wrong documents, names, dates and locations, but fails to provide the names of these witnesses or a description of the documents, names, dates and locations wrongly relied upon by counsel.  His summary arguments neither demonstrate constitutional error on the part of Salazar or that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See* <u>Strickland</u>, 466 U.S. at 694.

131.    In sum, the Court concludes that the state court's resolution of Ryan's claims was not contrary to, or an unreasonable application of clearly established federal law.  In addition, the Court is not persuaded that the state court's decision on Ryan's claims was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

**<u>Recommended Disposition</u>**

That all of Ryan's claims be denied on the merits and that this matter, in its entirety, be dismissed, with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge

44